## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| Interstate Bakeries Corporation, et al., | |
| | Case No. 04-45814 (JWV) |
| Debtors. | |
| | (Jointly Administered) |
| Lewis Brothers Bakeries Incorporated, and Chicago Baking Company, | |
| Plaintiffs, | |
| | Adversary No. 08-4239-JWV |
| v. | |
| Interstate Brands Corporation, | |
| Defendant. | |

### SUGGESTIONS IN SUPPORT OF PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

Lewis Brothers Bakeries Incorporated ("LBB") and Chicago Baking Company ("CBC"),

through their undersigned attorneys, and pursuant to Federal Rule of Bankruptcy Procedure 7056

and Local Rule 9013-1, hereby file their Suggestions In Support of their Motion for Summary

Judgment.

# <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF UNDISPUTED FACTS ................................................................ 1

MEMORANDUM OF LAW ................................................................................. 10

I.     INTRODUCTION .......................................................................................... 10

II.    STANDARD OF REVIEW ............................................................................. 11

III.   REASONS WHY THIS COURT MUST GRANT SUMMARY JUDGMENT IN
FAVOR OF LBB AND CBC ........................................................................ 12

      A.    THE LICENSE AGREEMENT IS NOT AN EXECUTORY CONTRACT
           THAT CAN BE REJECTED ............................................................ 12

            1.    The License Agreement Is Part of An Integrated Contract..................... 13

            2.    There Is No Substantial Performance Owed Under the Integrated
                 Contract or the License .......................................................... 15

            3.    Under the Functional Approach, the License Is Not Executory ............. 16

            4.    The License Agreement Was Actually A Sale of The Trademarks........ 17

      B.    IBC CANNOT REJECT THE LICENSE BECAUSE THE ANTITRUST
            JUDGMENT WAS STILL IN FORCE ON THE PETITION DATE ................. 19

      C.    THE DOCTRINE OF PROMISSORY ESTOPPEL PRECLUDES IBC
            FROM ASSERTING THAT THE LICENSE IS EXECUTORY ....................... 20

      D.    EVEN IF THE LICENSE AGREEMENT WAS AN EXECUTORY
            CONTRACT, EQUITY PRECLUDES IBC'S REJECTION............................ 22

            1.    The License Agreement Is Not Burdensome ........................................... 22

            2.    Rejection Would Provide IBC With An Improper Windfall at the
                 Expense of Its Creditors ........................................................ 23

IV.   CONCLUSION................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................................................. 11

Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864 (8th Cir. 2005) .............. 11

Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232 (7th Cir. 1991) ............................................. 12

BNY Cap. Funding LLC v. U.S. Airways, Inc., 345 B.R. 549 (E.D. Va. 2006) ......................... 22

Brown v. Snellen (In re Giesing), 96 B.R. 229 (1989) ................................................................ 24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................... 11

Chattanooga Mem. Park v. Still (In re Jolly), 574 F.2d 349 (6th Cir. 1978) ................... 16, 17, 23

City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221 (6th Cir. 1995).................. 14

Dolphin Titan Int'l, Inc. v. Gray & Co., Inc. (In re Dolphin Titan Int'l, Inc.), 93 B.R. 508

   (Bankr. S.D. Tex. 1988) .......................................................................................................... 23

Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.), 50 F.3d 233 (3d Cir.

   1994) ............................................................................................................................. 15, 16, 22

Frocks v. Ziff, 397 Ill. 497, 74 N.E.2d 699 (1947) ..................................................................... 13

Ghane v. West, 148 F.3d 979 (8th Cir. 1998) .............................................................................. 12

Gouveia v. Tazbir, 37 F.3d 295 (7th Cir. 1994) .................................................................... 15, 22

In re American Eagle Coatings, Inc., 353 B.R. 656 (Bankr. W.D. Mo. 2006) ...................... 11, 12

In re Bluman, 125 B.R. 359 (E.D.N.Y. 1991) ............................................................................. 23

In re Capital Acquisitions & Mgmt. Corp., 341 B.R. 632 (Bankr. N.D. Ill. 2006) .................... 22

In re Craig, 144 F.3d 593 (8th Cir. 1998) .................................................................... 13

In re Dunckle Assocs., Inc., 19 B.R. 481 (Bankr. E.D. Pa. 1982) ................................. 24

In re Newcomb, 744 F.2d 621 (8th Cir. 1984) ............................................................... 19

In re Pribonic, 70 B.R. 596 (Bankr. W.D.Pa. 1987) ............................................... 19, 20

In re Riodizio, Inc., 204 B.R. 417 (Bankr. S.D.N.Y. 1997) ...................................... 15, 19

In re the Penn Traffic Co., 524 F.3d 373 (2d Cir. 2008) ................................... 17, 19, 20

Intersport, Inc. v. National Collegiate Ath. Ass'n., 381 Ill. App. 3d 312, 885 N.E.2d 532 (1st

    Dist. 2008) ............................................................................................................. 13

Jenson v. Continental Fin. Corp., 591 F.2d 477 (8th Cir. 1979) .................................... 12

Laughlin v. Nickless, 190 B.R. 719 (D. Mass.) ....................................................... 17, 23

Lemon v. Kurtzman, 411 U.S. 192 (1973) .................................................................... 25

Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 804 F.2d 193 (2nd Cir. 1986) ...................... 18

Magnuson v. Schaider, 183 Ill. App. 3d 344, 538 N.E.2d 1309 (2d Dist. 1989) ......................... 13

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) .......................... 11

Mirant Corp. 318 B.R. 100 (N.D. Tex. 2004) ......................................................... 14, 19

Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill. 2d 46, 906 N.E.2d 520 (2009)

    .......................................................................................................................... 20, 21

Northwest Air. Inc. v. Klinger, 563 F.2d 916 (8th Cir. 1977) ....................................... 13

Peoples Nat'l Bank of Little Rock v. Linebarger Constr. Co., 219 Ark. 11, 240 S.W.2d 12

    (1951) .................................................................................................................... 21

Pro Page Partners, LLC v. Message Expr. Paging Co. (In re Pro Page Partners, LLC), 270 B.R. 221 (Bankr. E.D. Tenn. 2001) ................................................................................. 19

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303 (5th Cir. 1985)..................... 14, 17

Seattle Brewing & Malting Co. v. Commissioner, 6 T.C. 856, 69 U.S.P.Q. 656 (1946) ............. 19

Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735 (5th Cir. 1996) ... 14

The Conde Nast Publications, Inc. v.  United States, 575 F.2d 400 (2d Cir. 1978) ..................... 18

Unsecured Creditors Comm. V. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co., Inc.), 139 F.3d 702 (9th Cir. 1998) .......................................................................... 22

Widoe v. District No. 111 Otoe County Sch., 147 F.3d 726 (8th Cir. 1998) ............................... 12

**Statutes**

11 U.S.C. § 105.................................................................................................................... 24

11 U.S.C. § 365.............................................................................................................. 12, 22

26 U.S.C. § 1031................................................................................................................. 15

**Other Authorities**

Countryman, *Executory Contracts in Bankruptcy*:  *Part I*, 57 Minn. L. Rev. 439 (1973) ........... 12

R. Brazner, *Promissory Estoppel as a Basis for Avoidance of Statute of Frauds*, 56 A.L.R.3d 1037, 1974 WL 35112 (1974).................................................................................... 20

## STATEMENT OF UNDISPUTED FACTS

1.     On September 22, 2004, Interstate Bakeries Corporation and eight other subsidiaries and affiliates (the "Debtors") filed their Chapter 11 voluntary bankruptcy before this Court, commencing the above-captioned jointly-administered Chapter 11 reorganization cases. (Ex. A, Complaint, ¶ 4; Answer, ¶ 4 .)

2.     Defendant Interstate Brands Corporation ("IBC" or "Defendant") is one of the Debtors and is a Delaware Corporation.  (Ex. A, Complaint, ¶ 5; Answer, ¶ 5.)

3.     Plaintiff LBB is a Missouri corporation.  Plaintiff CBC is an Illinois corporation and a wholly-owned subsidiary of LBB.  (Ex. A, Complaint, ¶ 6; Answer, ¶ 6.)

4.     On or about January 9, 1996, in conjunction with Interstate Bakeries' acquisition of Continental Baking Company – owner of the Wonder Bread and Hostess brands and trademarks – the United States District Court for the Northern District of Illinois entered a final judgment (the "Judgment") in the antitrust action brought by the United States Department of Justice titled, *U.S. v. Interstate Bakeries Corporation and Continental Baking Company* (N.D. Ill., Case No. 95 C 4194).  (Ex. A, Complaint, ¶ 7; Answer, ¶ 7; Ex. B, Judgment; Ex. P., Motion to Reject, ¶ 11.)

5.     The Judgment required that, as a condition of Interstate Bakeries acquisition of Continental Baking, Interstate divest itself of the trademarks and all associated equipment and assets for one of the premium bread labels it sold – either the Butternut Label or Wonder Label in the Chicago Territory (as defined in Section II (F) and (I) of the Judgment), and either the Butternut, Sunbeam, or Wonder Label in the Central Illinois Territory (as defined in Section II(G) and (I) of the Judgment).  (Ex. B, Judgment, §§ II, IV.)  The Judgment had a term of ten

1

years, and was therefore, effective until January 9, 2006, and the District Court retained

jurisdiction over all matters regarding the terms of the Antitrust Judgment.  (Ex.B, Judgment, §§

XI, XII.)

6.    On December 27, 1996, in order for Interstate Bakeries to comply with the

Judgment, IBC, CBC, and LBB entered into an Asset Purchase Agreement (the "APA") under

which IBC, in exchange for $20 million paid by LBB and CBC and the assumption of various

liabilities related to IBC's businesses, would sell to LBB and CBC its Butternut Bread business

operations and assets in the Chicago Territory (which included Northwest Indiana and Eastern

Wisconsin), as well as its Sunbeam Bread business operations and assets in the Central Illinois

Territory.  (Ex. A, Complaint, ¶ 8; Answer, ¶ 8; Ex. C, APA, at § 1.1, 1.2.)[1]  IBC is designated as

the "Seller" in the APA and all of the assets that IBC "shall sell" to LBB/CBC, including the

trademarks, are defined as the "Assets Purchased".  (Ex. C, APA, § 1.1.)

7.    More specifically, the APA provided that IBC would sell to LBB and CBC all of

its Chicago Assets related to its Butternut bakery business in the Chicago Territory, including its

Chicago bakery, all of its Chicago machinery, equipment, and transport racks, all vehicles, route

trucks, tractor-trailers, and tractors, various real and personal property leases (including thrift

stores), all assigned contracts, and all packaging, ingredients, and inventory.  (Ex. C, APA, § 1.1,

1.2.)  Moreover, IBC agreed to grant a "perpetual, royalty-free, assignable, transferable exclusive

---

[1] Due to the volume of the schedules attached to the APA, LBB/CBC are attaching as Ex.
C only the APA itself and APA Schedule 1.2(e) (which identifies the Chicago Territory
trademarks transferred to LBB/CBC).

license to use" the Butternut trademark and the other IBC trademarks in the Chicago Territory as set forth in the APA.  (Ex. C, APA, § 1.2(e); Sched. 1.2(e).)[2]

8.      Similarly, the APA provided that IBC would sell to LBB and CBC all of its Sunbeam Assets in the Central Illinois Territory, just as it did with the Butternut Chicago Assets. But because IBC was only a licensee of the Sunbeam and other Central Illinois trademarks, IBC agreed to assign those trademark rights to LBB and CBC, and release its own license rights in those trademarks.  (Ex. C, APA, § 1.1, 1.3, 1.3(j); Ex. D, License Agreement, § 1.1(b).)

9.      Contemporaneous with the execution of the APA on December 27, 1996, IBC, LBB and CBC also executed a License Agreement, which in Section 1.1 granted LBB and CBC "a perpetual, royalty-free, assignable, transferable, exclusive . . . license" for the Butternut trademark (and other trademarks, as set forth in Schedule A to the License), and released all rights to the Sunbeam, Roman Meal, and Purity trademarks in the Central Illinois Territory, as well as the Sun Maid Raisin brand in the Chicago Territory. (Ex. D, License, § 1.1., Sched. A.)

10.     The License Agreement also provided that it, along with the other agreements referenced therein, including  the APA and the Allocation Agreement, constituted one entire agreement between the parties.  (Ex. D, License, § 9.1).  It also provided that it would be governed by Illinois law, like the APA.  (Ex. D, License, § 9.3; Ex. C, APA, § 18.6.)

11.     IBC, LBB, and CBC closed the sale of  the IBC's Chicago Territory and Central Illinois Assets on January 27, 1997 (the "Acquisition").  As part of the closing, the parties

--------

[2] In addition to referencing and incorporating the License in § 1.2(e), the APA also required an Allocation Agreement between the parties to allocate the "fair market values" of the assets being transferred, and provided that the sale to LBB/CBC would be structured as a Section 1031 Like-Kind Exchange by IBC.  (Ex. C, APA, §§ 2.3, 2.4.)

3

entered into, among other things, an Amendment to the APA, an Assignment and Assumption of Contracts Agreement, a Supply Agreement, a Vehicle Sublease, an Assignment of Assumed Collective Bargaining Agreements, and an Allocation Agreement.  (Ex. E, Final Closing List, reflecting more than 45 documents comprising the Acquisition transaction (LBB 00217-220), APA Amendment Letter, executed at closing and reflecting, among other things, IBC employee hiring process and thrift stores/terminals to be transferred (LBB 00298-306), and Allocation Agreement (LBB 00346-348).)

12.    Pursuant to the Allocation Agreement, the parties "agree[d] and acknowledge[d] that that the total value exchanged by IBC for the assets (excluding the Inventory) [was] $20,000,000."  (Ex. E, Allocation Agreement, § 2)  The parties further agreed that $8,120,000 of the "Purchase Price" would be allocated to sale of the Trademark Licenses.  (Ex. E, Allocation Agreement, § 3.)

13.    LBB and CBC, which originally were not interested in acquiring the hard assets of IBC, agreed to pay $20 million and acquire the hard assets and trademarks because officers of IBC told officers of LBB/CBC that IBC was selling to them the Butternut and other trademarks in the Chicago Territory, but IBC's officers also said that because IBC used the trademarks in other territories it could not issue a bill of sale and would instead provide LBB and CBC with a perpetual, exclusive, royalty-free, transferable license with all the earmarks of ownership.  (Ex. F, Affid. of Rodger Lesh, ¶¶ 4-7.)  In addition to agreeing to acquire and pay for IBC's hard

assets and the trademarks in the Acquisition, LBB and CBC agreed to and did hire approximately 1,400 of IBC's employees in Chicago and Central Illinois.  (Ex. F, Lesh, ¶ 5).[3]

14.      IBC itself intended to sell, and did sell, the Butternut and other trademarks in the Chicago Territory, according to Charles Sullivan, Chairman and CEO of IBC at the time of the transaction.  (Ex. H, Dep. Trans. of Charles Sullivan, at 3:21-23.)  IBC did so because it was required to permanently divest itself of the trademarks by the Justice Department, and did so because it would allow IBC to acquire Continental Baking and triple its size – to three billion dollars in annual sales – making it one of the largest baking companies in the country.  (Ex. H, Sullivan, at 5:8-19; 6:14-7:12; 9:1-5.)  IBC believed that it retained no ownership interest in Butternut or the other trademarks in the Chicago Territory, and that the trademarks could not later be taken back.  The price agreed to by IBC was a sale price and not an ongoing trademark license price.  (Ex. H, Sullivan, at 13:3-8; 20:3-15; 24:8-11.)

15.      Pursuant to the APA, IBC also divested itself of  the Central Illinois Territory trademarks by transferring the licensed trademarks to LBB/CBC and  surrendering its own licenses in those trademarks.  (Ex. C, APA, § 1.3(j); Ex. H, Sullivan, at 23:2-10; 31:20-32:12.)

16.      Ray Sandy Sutton, Vice President, General Counsel and Corporate Secretary of IBC at the time of the transaction, negotiated with the Justice Department regarding the antitrust lawsuit and the Judgment, and then with IBB/CBC regarding the Acquisition.  Sutton confirms that IBC was required to sell the trademarks by the Justice Department, and that is what IBC did.  (Ex. I, Dep. Trans. of Sutton, at 3:23-5:2; 7:24-8:17; 15:3-12; 17:1-15; 19:18-23; 23:2-12.)

---

[3] Of the $20 million paid to IBC by LBB and CBC, $17 million was paid in cash at closing and the buyers executed a $3 million note.  The note was paid in 2002.  (Ex. G, Dep. Trans. of Rodger Lesh, Aff., at 42:9-20.)

17.     IBC divested itself of the Butternut and other trademarks in the Chicago Territory

by means of a perpetual, exclusive, royalty-free license to LBB and CBC, as it had represented to

LBB/CBC, because IBC used the Butternut and other trademarks it owned in other territories,

but the intent was to sell Butternut and the other trademarks to LBB and CBC.  (Ex. I, Sutton, at

12:8-15:12.)

18.     After the transaction with LBB and CBC closed, IBC had no ongoing material

performance obligations to LBB or CBC.  (Ex. H, Sullivan, at 26:5-27:1.)  And since LBB and

CBC had already paid the $20,000,000 purchase price to IBC, LBB/CBC had no ongoing

performance obligations to IBC under the License or the other agreements to the Acquisition.

(Ex. G, Lesh, at 33:5-23.)

19.     The License, due to its perpetual, royalty-free nature, as well as lack of quality-

control monitoring, is unlike any true trademark license that LBB/CBC has with other trademark

licensees.  (Ex. G, Lesh, at 29:3-36:2.)  William Polash, LBB/CBC's expert, opines that the IBC

License "has all the characteristics of a sales agreement," and "Lewis Brothers, has all the

benefits of ownership of the Butternut trademark."  (Ex. J, Report of William Polash, § III, P. 5;

§ III.C, p. 14.)[4]

20.     As part of the Acquisition, and set forth in the Allocation Agreement, the parties

treated the Butternut and/other trademarks as having been sold and assigned the amount of

---

[4] IBC did not designate its own expert witness or a rebuttal expert witness – nor did it
take William Polash's deposition – so this Court should accept Polash's opinion as unrebutted
expert testimony.  See Planters' Oper. Co. v. Commissioner, 55 F.2d 583, 585 (8th Cir. 1932).
Because Polash's report is designated as "Confidential-Protective Order," it is being filed under
seal.

$8,120,000 as the purchase price for those trademarks.  (Ex. G, Lesh, at 46:19-47:5; Ex. H, Sullivan, at   34:1-18.)

21.    IBC believed that all the various agreements between IBC and LBB/CBC, including the APA, the License and the Allocation Agreement, constituted one contract.  (Ex. H, Sullivan, at 34:19-35:6; Ex. I, Sutton, at 27:4-9.)

22.    Consistent with Sullivan's and Sutton's opinions that IBC had sold the Butternut and other trademarks to LBB and CBC, IBC's internal tax documents also reflected the transfer of the trademarks as a sale.  (Ex. K, various IBC tax and accounting documents.)[5]  These documents treat the trademark transfer as a "Sale to Lewis" and $8,120,000 of "Goodwill sold to Lewis" (LB 00558), "LEWIS BROS SALE" (LB 00559), "Proceeds from sale to Lewis" (LB 00560), and on its income tax returns they stated that "IBC sold its operations in Chicago/Central Illinois to Lewis Bros"  (LB 00561-562).  (Ex. K.)

23.    In fact, IBC reported the Acquisition as a  Section 1031 Like-Kind Exchange under the Internal Revenue Code in order to defer the tax consequences of the sale of its Chicago and Central Illinois business operations to LBB/CBC.  (Ex. H, Sullivan, at 25:8-21; Ex. I, Sutton, at 20:15-21:8; Ex. K, at LB 00561-562.) [6]

_____

[5] IBC incongruously labeled its own document production in this case with the designation "LB 0001", et seq.  By email dated October 29, 2009, IBC's counsel stipulated to the admissibility of the documents contained in Ex. K.

[6] As further evidence of IBC's belief that it had sold all of the trademarks, in February 1999 IBC filed in the District Court Antitrust Case a motion and memorandum, seeking to modify or terminate the Judgment so that IBC could repurchase the Webers' Bread assets and trademarks (in the Southern California Territory) that IBC had also been required to sell under the terms of the Judgment.  (Ex. L, Motion and Memorandum In Support; Ex. B, Judgment, §§ II. J., K.)  IBC later withdrew its motion to modify the Judgment.

7

24.    Consistent with IBC's belief that it had sold the Butternut and other trademarks in the Chicago Territory, when IBC filed its bankruptcy schedules, it did not schedule the License as an executory contract.  (Ex. M, IBC Response to Requests to Admit, No. 12.)

25.    Since acquiring the Butternut and other trademarks, LBB and CBC have spent many years and a substantial amount of money expanding the value of the trademarks by introducing new products such as Butternut wholegrain white bread, Butternut 100 percent whole wheat bread, Butternut rye bread, and Butternut dinner rolls.  (Ex. G, Lesh, at 21:6-21.)  During that same time, LBB and CBC have also improved the quality of the products sold under the Butternut trademark (and the other trademarks acquired from IBC) by using better ingredients and improving shelf life.  (Ex. G, Lesh, at 33:24-35:5.)

26.    In 2008, Butternut products constituted between 10 and 20 percent of LBB's total sales, and 50 percent of CBC's sales.  (Ex. G, Lesh, at 13:24-15:14.)  In the 52-week period ending November 28, 2009, LBB/CBC had *net* Butternut sales of $21.3 million.  (Ex. J, Polash, at IV.A, p. 15.)  Importantly, new products introduced by LBB/CBC under the Butternut trademark account for a substantial amount of their sales; for example, in 2008, 100 percent whole wheat bread had sales of $3.7 million and wholegrain white bread had sales of roughly $1 million.  (Ex. G, Lesh, at 21:22-22:2; 27:14-16.)  And while the national average for growth of baked goods has been only one to two percent annually, LBB/CBC sales grew in the two to five percent range in 2008.  (Ex. G, Lesh, at 24:17-25.)

27.    If IBC rejects the License and LBB/CBC lose the ability to use the Butternut trademark and the other trademarks under the License, LBB/CBC's sales volume would shrink substantially, the companies would lose trademarks having a potential value of $100 million, and

8

CBC itself "would not be able to continue to operate as an ongoing company."  (Ex. G, Lesh, at 16:3-18:25.)

28.     LBB/CBC's expert confirms that the loss of the Butternut and other trademarks would have dire effects on LBB/CBC beyond the loss of more than $21.3 million in annual net sales – it would cause the collapse of CBC's Chicago store delivery system, the insolvency of CBC and its affiliate, North Baking Company (which makes private label bread for Jewel grocery stores, the largest grocery chain in the Chicago area, thus leaving Jewel without its private label bread supplier), the closure of at least one bakery owned by Holsum of Fort Wayne Incorporated (another affiliate), and the loss of more than 500 jobs.  (Ex. J, Polash, at IV, pp. 15-19.)

29.     Rejection and LBB/CBC's loss of the Butternut and other trademarks would even jeopardize the solvency and viability of LBB itself – and the jobs of its 2,100 employees – because LBB would lose 23 percent of its sales and directly incur $23.3 million of additional liabilities, including more than $13 million in severance pay and under-funded union pension liabilities, and $7.1 million in truck lease guaranty liabilities.  (Ex. J, Polash, at IV.D., p. 15.)

30.     Richard Seban, IBC's chief marketing officer and executive vice president, acknowledges that LBB/CBC are competitors of IBC in the Upper Midwestern area, and that IBC's sole intent in rejecting the License is to take back and use the trademarks it relinquished pursuant to the Judgment (including those in the Central Illinois Territory that IBC itself was a licensee of and the rights to which it has already surrendered) in order to gain market share in Chicago.  (Ex. N, Dep. Trans. of Richard Seban, at 8:1-15, 18:16-24, 32:18-24, 34:11-19.)

31.     Seban acknowledges that IBC does not seek to reject the License due to any burdens on IBC, since IBC has no performance obligations or burdens under the License, and

rejection of the License will result in no monetary savings for IBC.  (Ex. N, Seban, at 45:23-
46:4, 50:7-13; 56:20-57:2.)

32.     On November 21, 2008, shortly before IBC's plan confirmation, IBC made its
first disclosure of the License Agreement with LBB/CBC, when it filed its Amended Plan
Exhibit O (Schedule of Assumed Unexpired Leases and Non-Union Executory Contracts).  (Ex.
O, Amended Plan Ex. O, p. 84.)  In it, IBC notified its creditors that it would be assuming the
License.

33.     LBB, however, did not receive notice of Amended Plan Exhibit O, and after
receiving no clarification from IBC as to how it would treat the License in its Plan, filed an
objection to IBC's plan and the Adversary Complaint on December 1, 2008.  (Ex. A, Complaint,
¶ 14.)

34.     On December 4, 2004, IBC responded by filing its motion to reject the License.
(Ex. P, Motion to Reject.)

## MEMORANDUM OF LAW

## I.     INTRODUCTION

LBB/CBC brought this action asking this Court to declare that a perpetual,
exclusive, royalty-free License Agreement with IBC for 13 trademarks in the Chicago area,
including Butternut, was not an executory contract capable of rejection under Section 365 of the
Bankruptcy Code.  IBC responded with a motion asking this Court's approval of IBC's rejection
of the License.  This Court should grant LBB/CBC Summary Judgment since the undisputed
facts here prove that the License is not an executory contract because (a) it is part of a larger
integrated contract that has already been performed, (b) IBC cannot "cherry-pick" the License

for rejection, (c) there is no substantial performance left under the License, and (d) the License was actually a sale of the trademarks. Moreover, IBC cannot reject the License because the Antitrust Judgment was still in force when IBC filed bankruptcy, and IBC is precluded under the doctrine of promissory estoppel from denying that the transfer of the trademarks was a sale. Finally, even if the License is an executory contract, equity precludes rejection because the License is not burdensome on the new owners of IBC, and, if the License is rejected, it would confer an inequitable windfall on the new owners of IBC while causing irreparable damage to, and the possible bankruptcy of, LBB and CBC, along with the loss of thousands of jobs.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 868 (8th Cir. 2005); In re American Eagle Coatings, Inc., 353 B.R. 656, 660 (Bankr. W.D. Mo. 2006). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial, and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party's motion and give that party the benefit of all reasonable inferences to be drawn from the record. Widoe v. District No. 111 Otoe County Sch., 147 F.3d

726, 728 (8th Cir. 1998); <u>Ghane v. West</u>, 148 F.3d 979, 981 (8th Cir. 1998).  Nevertheless, the

court is "not required to draw every conceivable inference from the record-only those inferences

that are reasonable." <u>American Eagle Coatings</u>, 353 B.R. at 660 (citing <u>Bank Leumi Le-Israel,</u>

<u>B.M. v. Lee</u>, 928 F.2d 232, 236 (7th Cir. 1991)).

## III.    REASONS WHY THIS COURT MUST GRANT SUMMARY JUDGMENT IN FAVOR OF LBB AND CBC

### A.    THE LICENSE AGREEMENT IS NOT AN EXECUTORY CONTRACT THAT CAN BE REJECTED.

The License Agreement is not an executory contract that can be rejected pursuant to

Section 365 because:  (a) the License Agreement is not a stand-alone contract, but actually part

of an integrated contract made up of the APA, the Allocation Agreement, and all the other

contracts entered into as part of the transaction; (b) IBC cannot "cherry pick" parts of the

transaction to reject; (c) the License Agreement has been fully performed by the parties and is

therefore not "executory"; and (d) the License Agreement was actually a sale of the trademarks

in the Chicago Territory.

Section 365 allows a debtor to reject executory contracts after notice and a hearing.  11

U.S.C. § 365.  Although the Code does not provide a definition of what an "executory" contract

is, most courts, including the Eighth Circuit Court of Appeals, have adopted the Countryman

definition:

> 'a contract under which the obligations of both the
> bankrupt and the other party to the contract are so
> unperformed that the failure of either to complete
> performance would constitute a material breach
> excusing performance of the other.'

<u>Jenson v. Continental Fin. Corp.</u>, 591 F.2d 477, 481 (8th Cir. 1979) (quoting Countryman,

*Executory Contracts in Bankruptcy*:  *Part I*, 57 Minn. L. Rev. 439, 460 (1973), and quoting

Northwest Air. Inc. v. Klinger, 563 F.2d 916, 917 (8th Cir. 1977); In re Craig, 144 F.3d 593, 596 (8th Cir. 1998).

The undisputed facts and evidence in the immediate case demonstrate that the License Agreement is not an executory contract and that it cannot be assumed under Section 365.

> 1.    The License Agreement Is Part of An Integrated Contract.

Before determining whether the License is executory, and therefore capable of rejection – as IBC requests – this Court should first determine whether or not the License is a stand-alone contract or part of a larger, integrated group of contracts between IBC and LBB/CBC that encompassed the entire Acquisition transaction between the parties.

The parties agreed that Illinois law would govern both the APA and the License. (S.O.F. 10.) Under Illinois law it is long-settled that "instruments executed at the same time by the same parties, for the same purpose and in the course of the same transaction, are regarded as one instrument and will be construed together as if they were as much one in form as they are substance." Frocks v. Ziff, 397 Ill. 497, 504, 74 N.E.2d 699, 703 (1947). See also Intersport, Inc. v. National Collegiate Ath. Ass'n., 381 Ill. App. 3d 312, 319, 885 N.E.2d 532, 538-39 (1st Dist. 2008) (exclusive perpetual trademark license was one part of an entire contract and all documents comprising transaction must be reviewed to interpret license); Magnuson v. Schaider, 183 Ill. App. 3d 344, 357, 538 N.E.2d 1309, 1318 (2d Dist. 1989) (court must review all agreements comprising sale of a business when interpreting one of the agreements, because all are "essentially one contract").

IBC and LBB/CBC executed the APA and the License on the same date, and the APA required IBC to grant a perpetual, royalty-free license, and also required that both parties would enter into the Allocation Agreement prior to the closing of the Acquisition. (S.O.F. 7, 9.) Then on January 27, 1997, when the parties closed the Acquisition, they executed an Amendment to

the APA, the Allocation Agreement, and numerous other documents necessary to complete the Acquisition.  (S.O.F. 11.)  If there is any doubt that all of these documents constituted one integrated contract, it is dispelled by the terms of the License itself, which states that all the agreements between IBC and LBB/CBC constituted one agreement between the parties.  (S.O.F. 10.)  Under Illinois law, as well as the parties' intentions, the License, the APA, the Allocation Agreement, and all the other agreements executed at the closing of  the acquisition, comprised one contract; a contract that was fully performed 13 years ago.  (S.O.F. 14, 18, 31.)

It is well-established that a debtor cannot "cherry-pick" when assuming or rejecting an executory contract.  In other words, an executory contract cannot be assumed in-part or rejected in-part.  Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996); City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1226-27 (6th Cir. 1995); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  A debtor must therefore accept the entire contract or reject the entire contract, either accepting all the benefits and burdens or shedding all the benefits and burdens.  Covington, 71 F.3d at 1226-27.  Under this rule a debtor cannot reject the executory portions of a partially performed contract.  In re Mirant Corp., 318 B.R. 100, 104 (N.D. Tex. 2004) (refusing to allow the debtor to reject performance under a Back-to-Back Agreement because that agreement was entered into as part of an assert purchase agreement).  Richmond Leasing said it well:  "[T]he debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement."  762 F.2d at 1311.

IBC, however, seeks to engage in the very "cherry-picking" that is prohibited under Section 365(a); attempting to reject the License to take back Butternut and 12 other trademarks, while leaving the remainder of the Acquisition contract in place and keeping the $20 million IBC

14

was paid, while also receiving the benefit of the Section 1031 Like-Kind Exchange.[7]  Because

IBC attempts to reject only the License portion of its contract with LBB/CBC, IBC's motion to

reject must be denied.

        2.     There Is No Substantial Performance Owed Under the Integrated Contract
               or the License.

Under the Countryman test, a contract is considered executory when both parties are

obligated to render substantial performance under the contract.  Enterprise Energy Corp. v.

United States (In re Columbia Gas Sys., Inc.), 50 F.3d 233, 239 (3d Cir. 1994); In re Riodizio,

Inc., 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997).  "Where such performance remains due on only

one side, the contract is non-executory, and hence, neither assumable nor rejectable."  Riodizio,

204 B.R. at 421.  See also Columbia Gas, 50 F.3d at 239 ("In cases where the non-bankrupt party

has fully performed, it makes no sense to talk about assumption or rejection").  Moreover,

ministerial, nonmaterial acts remaining to be performed under a contract do not make it

executory.  Columbia Gas, 50 F.3d at 244, n. 20.  See also Gouveia v. Tazbir, 37 F.3d 295, 298-

99 (7th Cir. 1994) ("almost all agreements to some degree involve unperformed obligations on

either side . . . such an expansive definition of the term "executory" is not what Congress enacted

through its choice of language") (citation omitted).

In this matter, both former and current executives of IBC admit that, in addition to

believing that IBC sold the trademarks in the Acquisition, there were no performance obligations

owed to LBB/CBC by IBC.  (S.O.F. 14, 18, 31.)  And similarly, LBB/CBC had no ongoing

---

[7] A Section 1031 Like-Kind Exchange allows a party that completely disposes of
property in exchange for a similar type of property to defer the tax on the gain that otherwise
would result from the exchange.  Under the Internal Revenue Code such an exchange must be
fully consummated within a 180 day period in order to give the taxpayer the deferral it seeks. See
26 U.S.C. § 1031.

performance obligations to IBC under the License or other agreements making up the entire contract after they paid the $20 million purchase price. (S.O.F. 18.)  Hence the contract is not executory under the Countryman definition and is therefore ineligible for rejection or assumption.

"In cases where the non-bankrupt party has fully performed, it makes no sense to talk about assumption or rejection." <u>Columbia Gas</u>, 50 F.3d at 239.  In fact, applying the pure Countryman test to determine if a breach by IBC under the License would excuse performance by LBB/CBC would lead to the nonsensical result of which <u>Columbia Gas</u> warned.  For example, if IBC breached the License by not doing a ministerial task, like monitoring LBB/CBC Butternut Bread quality (which it admits it did not do), LBB/CBC would be excused from their obligation to make high-quality Butternut Bread.  But why would LBB/CBC want to stop making high-quality Butternut Bread, since they paid $20 million – and invested many millions more – for the right to do so?  This demonstrates why the License is not executory under the Countryman  test and why LBB/CBC should receive summary judgment.

      3.     <u>Under the Functional Approach, the License Is Not Executory.</u>

Some courts have adopted what is known as the Functional Approach to determine if a contract is executory.  Under this approach, the License is not an executory contract.

The Sixth Circuit first developed the Functional Approach in <u>Chattanooga Mem. Park v. Still (In re Jolly)</u>, 574 F.2d 349 (6th Cir. 1978), <u>cert. denied</u>, 439 U.S. 929 (1978).  "The key . . . is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish.  If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act." <u>Id</u>. at 351.

The Court in <u>Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)</u>, 10 F.3d 944

(2d Cir. 1993) observed that

> 'The main purpose of Section 365 is to allow a debtor to
> reject executory contracts in order to relieve the estate of
> burdensome obligations while at the same time providing 'a
> means whereby a debtor can force others to continue to do
> business with it when the bankruptcy filing might otherwise
> make them reluctant to do so.'

<u>Id</u>. at 954-55 (quoting <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d at 1310). <u>See also</u>

<u>In re the Penn Traffic Co.</u>, 524 F.3d 373, 382 (2d Cir. 2008); <u>Laughlin v. Nickless</u>, 190 B.R. 719,

723 (D. Mass.) (contract not executory if objective achieved).

IBC seeks to reject the License, but there are no burdens to reject, and the objective of the

contract – the transfer of IBC's Chicago and Central Illinois operations – has already been

achieved.  As the current and former IBC executives acknowledge, IBC had nothing more to do

once it completed the sale to LBB/CBC, and they have done nothing since that time.  (S.O.F. 14,

18, 31.)  And notably, rejection will relieve IBC of no financial burden or expense.  (S.O.F. 31.)

Thus, under the Functional Approach of <u>Jolly</u>, the License (and the other agreements comprising

the Acquisition contract) are not executory and therefore cannot be rejected.

4.     <u>The License Agreement Was Actually A Sale of The Trademarks</u>.

There can be no argument that the parties intended to sell the trademarks and that the

License was truly a sale of the trademarks in the Chicago Territory.[8]   First, the Judgment

required that IBC <u>divest</u> itself of <u>all</u> its assets for its Chicago operations, which IBC did through

---

[8] IBC's Motion to Reject, although also purportedly seeking to reject the transfer of
licenses to the Central Illinois Territory trademarks and the Sun Maid Raisin trademark in the
Chicago Territory (S.O.F. 30), fails to address how rejection will allow IBC to take back such
trademarks, since IBC admits that it was only a licensee for such trademarks and it surrendered
any license rights in those trademarks as part of the Acquisition.  (S.O.F. 15.)

the Acquisition.  (S.O. F. 5-7.)  Second, LBB/CBC wanted to purchase the trademarks and were told by IBC executives that they were purchasing them, and the IBC executives truly believed they were selling them.  (S.O.F. 13-17.)  Third, the trademarks were priced as if they were being sold.  (S.O.F. 14.)  Fourth, the License Agreement itself, with its grant of a perpetual, exclusive, royalty-free, transferable "license" had all the ear markings of a sale, is unlike any other trademark license which LBB/CBC is a party to, and is, in the opinion of LBB/CBC's expert witness, a sale agreement.  (S.O.F. 19.)  Fifth, the Acquisition closing documents, such as the Allocation Agreement, ascribed an $8.1 million "Purchase Price" to the trademarks.  (S.O.F. 11-12, 20.)  Sixth, after the Acquisition, IBC treated the transfer as a Section 1031 Like-Kind Exchange for tax purposes, and reflected on its books and records, as well as its tax filings, that the trademarks had been sold.  (S.O.F. 21-23.)  Seventh, IBC represented/admitted in subsequent pleadings filed in the Antitrust Case that it had sold the trademarks as required by the Judgment.  (S.O.F. 23, n. 6.)  Finally, IBC did not schedule the License as an executory contract in its bankruptcy schedules.  (S.O.F. 24.)

The law is well-established that, in the context of a business sale, minor ancillary agreements do not allow the seller of the business to retain legal ownership of that business, or even parts of the business.  See The Conde Nast Publications, Inc. v. United States, 575 F.2d 400, 405-06 (2d Cir. 1978) (finding that a trademark license, in the context of sale of the business, was actually a sale of the trademark, despite quality-control provisions in license, because license did not give seller any continuing interest or participation in the business); Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 804 F.2d 193, 198 (2nd Cir. 1986) (lease not an executory contract, but instead a disguised security agreement, in sale-leaseback transaction); Pro Page Partners, LLC v. Message Expr. Paging Co. (In re Pro Page Partners, LLC), 270 B.R.

221, 227-28 (Bankr. E.D. Tenn. 2001) (transfer of management of business operations, with option to purchase, was a disguised financing arrangement, and not an executory contract). Seattle Brewing & Malting Co. v. Commissioner, 6 T.C. 856, 69 U.S.P.Q. 656 (1946) (grant of an exclusive right to use trade names in limited territory, in perpetuity, was a sale of the trade names).

Because IBC sold the Chicago Territory trademarks to LBB/CBC, the License is not executory and cannot be rejected. See Mirant, 318 B.R. at 104.

B.    IBC CANNOT REJECT THE LICENSE BECAUSE THE ANTITRUST JUDGMENT WAS STILL IN FORCE ON THE PETITION DATE.

Irrespective of whether or not the License Agreement is executory, IBC cannot reject the License because the Antitrust Judgment was still in effect on IBC's Petition Date. "Executoriness and the debtor's rights with respect to assumption or rejection of an executory contract are normally assessed as of the petition date."  In re The Penn Traffic Company, 524 F.3d at 381.  See also In re Newcomb, 744 F.2d 621, 624 (8th Cir. 1984); In re Riodizio, 204 BR. 417, 421 (Bankr. S.D.N.Y. 1997).  In re Pribonic, 70 B.R. 596, 603 (Bankr. W.D.Pa. 1987) is very instructional here.  In Pribonic, the bankruptcy court held that where another court has reduced an agreement to judgment and ordered a party's specific performance, the agreement was no longer executory because the only performance required was the ministerial act of compliance with the order.  Id. at 599.

Here, IBC commenced its bankruptcy on September 22, 2004.  (S.O.F. 1.)  But the Antitrust Judgment, effective January 9, 1996, had a 10-year term, and thus did not expire until January 9, 2006.  (S.O.F. 5, 6.)  The Judgment required that IBC divest itself of all trademarks, associated equipment, and assets of the Butternut and other labels in the Chicago Territory for a 10-year period.  (S.O.F. 4, 5.)  Pursuant to the APA and License Agreement, IBC complied with

19

the Judgment by transferring the Butternut and other Chicago Territory trademarks, as well as all

other assets related thereto to LBB and CBC.  (S.O.F. 4, 6-11.)  Once the Judgment was entered

in 1996, all that remained was for IBC to comply with the Judgment by completing the

ministerial act of transferring its Chicago and Central Illinois operations and assets to LBB/CBC.

See Pribonic, 70 B.R. at 599.

When IBC filed its Chapter 11 petition on September 22, 2004, its rights to assume or

reject executory contracts was fixed, as was the determination of whether such contracts were

executory.  Penn Traffic, 524 F.3d 373.  Because the 10-year term of the Judgment was still

effective and binding on IBC on the Petition Date, IBC was still bound by its terms and thus had

no right to reject on that date – the date on which its rejection rights under Section 365 were

fixed.  In fact, IBC would have been in direct violation of the Judgment had it sought to reject

the License on or near the Petition Date, and this Court would not have even had the authority to

consider any such motion, as the District Court had retained jurisdiction for all matters pertaining

to the Judgment, including "the modification of any of the provisions hereof."  (S.O.F. 5.)

For these reasons, this Court must enter summary judgment for LBB/CBC and deny

IBC's motion to reject the License.

C.    THE DOCTRINE OF PROMISSORY ESTOPPEL PRECLUDES IBC FROM
ASSERTING THAT THE LICENSE IS EXECUTORY

The doctrine of promissory estoppel "'is most extensively recognized and most

frequently applied where there is a promise as to an intended abandonment of existing rights.'"

Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill. 2d 46, 54, 906 N.E.2d 520, 525

(2009) (quoting R. Brazner, Promissory Estoppel as a Basis for Avoidance of Statute of Frauds,

56 A.L.R.3d 1037, 1042, 1974 WL 35112 (1974)).  To establish promissory estoppel a party

must prove that (i) defendant made an unambiguous promise, (ii) plaintiff relied on the promise,

(iii) the reliance was expected and foreseeable, and (iv) plaintiff relied to its detriment.  Kubota, 233 Ill. 2d at 51, 906 N.E.2d at 523-24.  Promissory estoppel "'is an attempt by the courts to keep remedies abreast of increased moral consciousness' of honesty and fair representations in all business dealings.'"  Id. at 55, 526 (quoting Peoples Nat'l Bank of Little Rock v. Linebarger Constr. Co., 219 Ark. 11, 17, 240 S.W.2d 12, 16 (1951)).

The undisputed facts demonstrate that the requirements of promissory estoppel exist such that the License should not be treated as a license that is executory, and instead be treated as part of a sale by IBC of its trademarks in the Chicago and Central Illinois territories.  First, IBC made an unambiguous promise that it was selling the trademarks to LBB/CBC.  (S.O.F. 7, 12-17). Second, LBB/CBC relied on the promise, as reflected by the payment of an $8.1 million sale price for the trademarks.  (S.O. F. 8, 12-13, 20).  Third, the reliance was foreseeable by IBC. (S.O.F. 8, 12-13.) And fourth, LBB/CBC relied to their detriment, paying a $8.1 million sale price for the trademarks, $11.9 million for IBC's other hard assets, and hiring 1,400 of IBC's employees, spent many years and many millions of dollars to expand and improve the trademarks, yet now faces the risk of losing the trademarks, as well as the possible bankruptcy of its entire business.  (S.O.F. 12-14, 25-29).

A more appropriate case for promissory estoppel cannot be found.  LBB/CBC paid a huge amount of money to buy IBC's business operations and trademarks, and built a substantial business around those trademarks.  If this Court allows IBC to "break its promise" and reject the License, irreparable and unconscionable harm will be done to LBB/CBC.

This Court should therefore grant summary judgment for LBB/CBC and deny IBC's rejection motion, thereby requiring IBC to observe the "increased moral consciousness of honesty and fair representations in all business dealings."  Kubota at 55, 526.

D.     EVEN   IF   THE   LICENSE   AGREEMENT   WAS   AN   EXECUTORY
CONTRACT, EQUITY PRECLUDES IBC'S REJECTION.

1.     The License Agreement Is Not Burdensome.

Even if the License Agreement is executory, it cannot be rejected because it is not burdensome.  The primary purpose of rejection under Section 365 is to allow a debtor to avoid burdensome obligations.  Frito-Lay, 10 F.3d at 954-55.  Yet here, former and current executives admit that after the Acquisition closed, there were no burdensome obligations for IBC.  (S.O.F. 18, 31.)  And to the extent that IBC might attempt to argue that there were some burdensome obligations on IBC that it now needs to reject – despite the unequivocal testimony of Richard Seban to the contrary – case law holds that boilerplate, ministerial duties, or future contingent obligations that may or may not occur are not substantial performance obligations that make an agreement an executory contract.  See Unsecured Creditors Comm. V. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co., Inc.), 139 F.3d 702, 705-06 (9th Cir. 1998) (en banc); Columbia Gas, 50 F.3d at 244, n. 20; Gouveia, 37 F.3d at 298-99; BNY Cap. Funding LLC v. U.S. Airways, Inc., 345 B.R. 549, 552-53 (E.D. Va. 2006); In re Capital Acquisitions & Mgmt. Corp., 341 B.R. 632, 636-37 (Bankr. N.D. Ill. 2006).

Because there are no burdensome obligations on the new owners of IBC under the License, IBC's Motion to reject should be denied.[9]

---

[9] Indeed, because IBC's new owners no longer seek to assume the License, under the Code they are not bound by any License obligations anyway.  See 11 U.S.C. § 365.

22

       2.    <u>Rejection Would Provide IBC With An Improper Windfall at the Expense
of Its Creditors</u>.

This Court should not permit IBC's "rejection" of the License because the sole purpose

of IBC's new owners is to improperly reverse a sale that took place 13 years ago in order to gain

market share from its main Midwestern competitor and to reap a financial windfall.

In <u>In re Bluman</u>, 125 B.R. 359 (E.D.N.Y. 1991), the court denied the debtor's motion to

reject a non-compete contract after it had sold its business.  The court noted that the debtor did

not seek rejection in order to gain a fresh start from burdensome obligations, but instead to

receive proceeds of the contract at the expense of his creditors.  <u>Id</u>. at 363.  The court noted that

the power of rejection should only be used when it benefits the estate and "should not extend to

situations where the only effect of its exercise would be to prejudice other creditors of the

estate."  <u>Id</u>. (also citing <u>Jolly</u>, 574 F.2d at 351, for premise that a contract is not executory if the

purpose for rejection already accomplished).  <u>See also</u> <u>Laughlin v. Nickless</u>, 190 B.R. 719, 723

(D. Mass. 1996) (denying rejection because it would not benefit the estate and it would create a

cash windfall for rejecting party); <u>Dolphin Titan Int'l, Inc. v. Gray & Co., Inc. (In re Dolphin

Titan Int'l, Inc.)</u>, 93 B.R. 508, 511-12 (Bankr. S.D. Tex. 1988) (denying rejection because "even

were the contract to be viewed as executory, rejection of the contract here is inequitable,

representing a windfall to which the debtor would not have been entitled absent the filing of

bankruptcy and causing damage to Gray & Co., Inc. disproportionate to any benefit to be derived

by the debtor or its creditors").

In the immediate case, as in <u>Bluman</u>, IBC points to no burdensome or financial obligation

it seeks to avoid through rejection.  (S.O.F. 18, 31.)  In fact, IBC admits that its only goal is to

take back 13 or more valuable trademarks for which it was already paid in full, at the expense of

its competitor.  (S.O.F. 6-9, 11, 13-17, 30.)  By rejecting the License, IBC, after already

23

receiving an $8.1 million purchase price for its trademarks and $11.9 million for its hard assets (and being allowed to proceed with the Continental Baking acquisition due to LBB/CBC's purchase), will kill two birds with one stone – take away trademarks now worth possibly $100 million dollars and deal a death blow to its chief Midwestern rival. (S.O.F. 27-30.)  Importantly too, the domino-effect of License rejection would likely not stop at LBB, since an LBB bankruptcy would likely result in the Pension Benefit Guaranty Corporation taking over the $12-13 million in pension liabilities.

It is of no concern to the new owners of IBC that they have no burdens under the License or that (a) LBB/CBC stepped in to help IBC in its Continental Baking acquisition, (b) that LBB/CBC paid a full purchase price for the trademarks and took on IBC's hard assets and more than 1,400 IBC employees, (c) that LBB/CBC have worked hard over the past 13 years to improve the quality of the bread brands and value of the trademarks, and (d) that removing trademarks will cause irreparable harm to LBB and CBC, causing the bankruptcy of CBC and possibly LBB, with the loss of hundreds, if not thousands, of jobs. (S.O.F. 25-31.)  It appears that IBC's new owners are motivated only by the desire to increase profits and market share, for how else can IBC explain its early notice that it would assume the License Agreement, and then its about-face by moving to reject the License and reclaim the trademarks? (S.O.F. 32.)

Section 105(a) of the Code, gives this Court broad equitable powers that are necessary or appropriate to carry out the provisions of the Code, where substantial justice requires. 11 U.S.C. § 105;  In re Dunckle Assocs., Inc., 19 B.R. 481, 484 (Bankr. E.D. Pa. 1982).  Such equitable considerations were recognized by Judge Koger to be applicable in considering a Section 365 rejection motion.   In Brown v. Snellen (In re Giesing), 96 B.R. 229, 231 (1989), Judge Koger denied rejection of a contract, stating "[i]f rejection of a contract, executory by definition, would

24

not advance the Code's purpose of adding to or detracting from the estate's benefits or liabilities, the contract is not 'executory'".  Judge Koger observed that the "definition of an executory contract is not an unbinding one to which the Court must adhere at the expense of advancing the Code's purposes and the debtor's goals to reach equitable results."  Id.  As Chief Justice Burger stated in Lemon v. Kurtzman, 411 U.S. 192, 201 (1973):  "In equity, as nowhere else, courts eschew rigid absolutes and look to practical realities and necessities inescapably involved in reconciling competing interests . . . .  Moreover, equitable remedies are a special blend of what is necessary, what is fair and what is workable."

Clearly, rejection under Section 365 and the equitable considerations imposed by Section 105(a) are not intended to permit the grave injustice and far-reaching harm that IBC seeks, especially when its requested rejection is likely to cause a painful bankruptcy similar to what IBC itself underwent.  For these equitable reasons alone, this Court must deny IBC's motion and grant summary judgment in LBB/CBC's favor.

## IV.    CONCLUSION

It is clear from the facts that the License was simply one portion of a larger sale transaction mandated by the United States District Court for the Northern District of Illinois.  By agreeing to and completing the transfer to LBB/CBC of its Butternut Operations in the Chicago Territory and its Sunbeam Operations in the Central Illinois Territory, the Northern District and the Justice Department allowed IBC to acquire Continental Baking – which allowed IBC to more than triple its size, acquire the preeminent baking labels in the United States, Wonder and Hostess, and become the largest baking company in the United States.  Although, in hindsight, the Continental Baking acquisition may not have been the jewel that IBC envisioned, it was the

25

court-mandated sale of the Butternut and Sunbeam Operations to LBB/CBC that allowed it to take place.

Now, thirteen years later, after LBB/CBC paid $20 million to IBC and acquired all of the hard assets, trademarks, and 1,400 employees associated with IBC's Butternut and Sunbeam Operations – all pursuant to the antitrust Judgment – the current owners of IBC attempt to use Section 365 of the Bankruptcy Code as a "gotcha" provision rejecting one portion of a large, comprehensive contract by making the hypertechnical argument that the License between the parties should be viewed in an isolated, detached state, instead of in the context of the entire Acquisition, and that because the License might contain some contingent, future performance obligations, it can be rejected and the already paid for trademarks reclaimed from LBB/CBC.

The current owners of IBC do not, and in fact cannot, dispute that when the original transaction with LBB/CBC occurred, IBC was paid $20 million value for its Butternut and Sunbeam Operations, that IBC viewed (and the Justice Department and District Court required) the transfer of all the assets – including the Butternut and other trademarks – as a sale, that the purchase price of all the assets and trademarks reflected a sale price, and that IBC held out and represented to LBB/CBC that the transfer of the trademarks was a sale, as reflected in the "perpetual, royalty-free, assignable, transferable exclusive" language in the License. Moreover, the new owners of IBC admit that IBC itself treated the transfer of the trademarks as a sale on its accounting records after the transaction, and treated the transaction as a sale by reporting it as a Section 1031 Like-Kind Exchange in its tax returns. And importantly, IBC and its new owners admit that neither LBB/CBC nor IBC had any material, ongoing obligations under the License (on any of the other agreements) after the sale closed (other than LBB/CBC's payment of the

26

promissory note, which they did many years ago), that IBC did nothing more related to the License, and there are no burdens on IBC that will be alleviated by rejection of the License.

Instead, the new owners admittedly seek to "cherry pick" the License out of the entire transaction with LBB/CBC and reject it for no reason other than the fact that LBB/CBC are competitors of IBC in the Midwestern United States, and rejection will allow IBC to take the already paid-for trademarks and increase IBC's market share and profits in the Chicago and Central Illinois Territories.

Sadly, the new owners of IBC seek to reclaim the trademarks for purely mercenary reasons, without any concern for the effects that such conduct will have on LBB and CBC. For it is uncontroverted that LBB/CBC, after paying millions of dollars for the trademarks, and working hard and spending a great deal of money to successfully expand and build the brands over several years, will face dire consequences if the trademarks are pulled:  CBC and another LBB subsidiary will undoubtedly become insolvent and hundreds of employees will lose their jobs.  And because of upstream pension and guaranty liabilities, LBB will be hit with not only the loss of more than $23 million in sales, it will be hit with millions of dollar in immediate pension and other liabilities that could equal or exceed its loss in sales.  Such a one-two punch could very well lead to LBB's bankruptcy, along with the loss of  thousands of jobs and eventual PBGC assumption of LBB's pension liabilities.  It would be tragic if the bankruptcy of IBC would be followed by and cause more bankruptcies, solely due to the use of Section 365 by the new owners of IBC for their own financial gain.

Surely, this is not what the law or equity intends through the use of Section 365.

For all the reasons set forth above, this Court should grant summary judgment in LBB/CBC's favor, holding that the License Agreement is not executory, and denying IBC's Motion to Reject.

Dated: March 26, 2010                              Respectfully submitted,


                                                  LEWIS BROTHERS BAKERIES
                                                  INCORPORATED, AND CHICAGO
                                                  BAKING COMPANY


                                                   /s/ Eric L. Johnson
                                                  Leslie A. Greathouse  MO #48431
                                                  Eric L. Johnson        MO # 53131
                                                  Spencer Fane Britt & Browne LLP
                                                  1000 Walnut Street, Suite 1400
                                                  Kansas City, Missouri 64106-2140
                                                  Tel:    816-474-8100
                                                  Fax:    816-474-3216

                                                          AND

                                                  Eugene J. Geekie, Jr. (Pro Hac Vice) MO #34090
                                                  Schiff Hardin, LLP
                                                  233 S. Wacker Drive, Suite 7500
                                                  Chicago, IL 60606
                                                  Tel: (312) 258-5500
                                                  Fax: (312) 258-5600