# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| INTERSTATE BAKERIES CORP., et al., | ) | Case No. 04-45814 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| LEWIS BROTHERS BAKERIES INC., and | ) | |
| CHICAGO BAKING CO., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 08-4239 |
| | ) | |
| INTERSTATE BRANDS CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on cross-motions for summary judgment. The sole issue for consideration in these motions as well as the Plaintiffs' complaint is whether a license agreement between the parties granting the Plaintiffs a perpetual, royalty-free trademark license (the "License") to certain brands of bread is an executory contract for purposes of assumption pursuant to 11 U.S.C. § 365. The Defendant argues that it is; the Plaintiffs argue that it is not. For the reasons stated below, the Court finds that the undisputed facts establish that the License is an executory contract. Therefore, the Court will grant the Defendant's motion for summary judgment and deny the Plaintiffs' motion.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[1] In a motion for summary judgment, the moving party has the initial burden of demonstrating the absence of genuine issues of material fact.[2] Once the moving party has met this

---

[1] Fed. R. Bankr. P. 7056.

[2] *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1983).

initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings; self-serving allegations or mere assertions of disputed fact are insufficient to defeat the motion.[3]

## PROCEDURAL BACKGROUND

The Debtor, Interstate Bakeries Corp., first disclosed the existence of the License with the Plaintiffs Lewis Brothers Bakeries Inc., and Chicago Baking Co. (collectively "LBB/CBC") in an amended exhibit filed on November 21, 2008, to its proposed plan of reorganization. Apparently, the Debtor had failed to disclose the license agreement as an executory contract in its Bankruptcy Schedules and Statements of Financial Affairs. The amended exhibit – Amended Plan Exhibit O: Schedule of Assumed Unexpired Leases and Non-Union Executory Contracts – identified the License as one of the executory contracts the Debtor intended to assume as part of its plan of reorganization. LBB/CBC filed this adversary complaint on December 1, 2008, seeking a determination that the license agreement is not an executory contract for purposes of assumption or rejection under 11 U.S.C. § 365.

On December 4, 2008, the Debtor filed a motion to reject the License. The Debtor's Answer and Counterclaim to LBB/CBC's complaint, filed on January 8, 2009, reiterated its intent to reject the License and sought a declaratory judgment that the License is an executory contract capable of rejection under § 365.

Both parties filed motions for summary judgment. Shortly after each party had filed a response to the other's motion for summary judgment, however, the Debtor filed a notice withdrawing its motion to reject the License filed in the main case and its Counterclaim seeking rejection of the License. The notice further stated that the Debtor was "reinstating" its request to assume the License pursuant to Amended Plan Exhibit O, and that the withdrawal of its Counterclaim does not affect its request for a declaratory judgment that the License is an executory contract. The Court granted the Debtor's withdrawal of its Counterclaim on April 27, 2010.

---

[3] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872-73 (8th Cir. 2005).

**UNDISPUTED FACTS**

The Court's recitation of undisputed facts is limited to those bearing on whether the License is executory; facts bearing on the propriety of IBC's now-withdrawn Counterclaim and motion to reject the License have been omitted.

1. On September 22, 2004, Interstate Bakeries Corporation and eight other subsidiaries and affiliates, including Defendant Interstate Brands Corporation ("IBC"), filed Chapter 11 voluntary bankruptcy petitions in this Court.

2. Plaintiff Lewis Brothers Bakeries Inc., is a Missouri corporation, and Plaintiff Chicago Baking Co., is an Illinois corporation, wholly-owned by Lewis Brothers Bakeries Inc.

3. On or about January 9, 1996, in conjunction with Interstate Bakeries Corp.'s acquisition of Continental Baking Company – owner of the Wonder Bread and Hostess brands and trademarks – the United States District Court for the Northern District of Illinois entered a final judgment ("Judgment") in an antitrust action brought by the United States Department of Justice and captioned *U.S. v. Interstate Bakeries Corporation and Continental Baking Company* (N.D. Ill., Case No. 95 C 4194).

4. The Judgment required that, as a condition of Interstate Bakeries Corp.'s acquisition of Continental Baking, IBC divest itself of certain rights and assets for the purpose of establishing viable competitors in the sale of "White Pan Bread" in and around the Chicago, Illinois area.

5. With regard to IBC's divestiture of trademarks, the Judgment directed IBC to grant to one or more purchasers a "perpetual, royalty-free, assignable, transferable, exclusive" license to use the "Relevant Labels," which included the Butternut Label and Wonder Label in the Chicago Territory (defined in the Judgment), and either the Butternut, Sunbeam, or Wonder Label in the Central Illinois Territory (also defined in the Judgment).

6. The Judgment states that it "expires" on the tenth anniversary of the date of its entry.

7. On December 27, 1996, IBC, CBC, and LBB entered into an Asset Purchase Agreement ("APA") under which IBC, in exchange for $20 million paid by LBB and CBC and the assumption of various liabilities related to IBC's businesses, would sell to LBB and CBC its Butternut Bread business operations and assets in the Chicago Territory, as well as its Sunbeam Bread business operations and assets in the Central Illinois Territory. IBC is designated as the "Seller" in the APA and all of the assets that IBC "shall sell" to LBB/CBC, including the trademarks, are defined as the "Assets Purchased." Under the APA, IBC agreed to grant a "perpetual, royalty-free, assignable, transferable exclusive license" to use the Butternut trademark and the other IBC trademarks in the Chicago Territory.

8.      Contemporaneous with the execution of the APA on December 27, 1996, IBC, LBB and CBC executed the License, which granted LBB and CBC "a perpetual, royalty-free, assignable, transferable, exclusive . . . license" for the Butternut trademark (and other trademarks, as set forth in Schedule A to the License), and released all rights to the Sunbeam, Roman Meal, and Purity trademarks in the Central Illinois Territory, as well as the Sun Maid Raisin brand in the Chicago Territory.

9.      The following provisions of the License are pertinent to the resolution of the summary judgment motions now before the Court:

    a.      In the first "WHEREAS" clause: "IBC is the owner of or has the right to use and sublicense to Licensee (LBB/CBC) the trademarks, labels and logos and registrations thereof set forth in Schedule A hereto."

    b.      In the second WHEREAS clause: "[I]n order to comply with the Final Judgment . . . IBC has agreed to extend a license to Licensee and Licensee desires to make use of the Trademarks subject to the terms and conditions set forth herein."

    c.      Section 1.1(a): "IBC expressly reserves from such license all rights and uses of the Chicago Trademarks outside the Chicago Territory. . . . IBC also expressly reserves from such license all rights and uses of the Chicago Trademarks in the Chicago Territory on products other than fresh and returned bread, buns, bread rolls and other bakery products."

    d.      Section 1.4: "Licensee shall have no right to sublicense the Trademarks or the use of the Trademarks to any third party."

    e.      Section 2.1: "Licensee acknowledges and agrees that IBC is the exclusive owner of or has the right to use, the Trademarks and all goodwill associated therewith and that IBC shall retain the full ownership interest in and to the Trademarks; the associated goodwill and all registrations granted thereon; and that all use of the Trademarks by Licensee shall inure to the benefit of and be available to IBC.  Except for the rights specifically granted or licensed herein, Licensee shall have no rights to the Trademarks."

    f.      Section 2.2: "Licensee shall not anywhere register, or cause to be registered, any corporate logo, name or trademark consisting of, comprising or containing the Trademarks, including without limitation any registration in the United States Patent and Trademark Office."

    g.      Section 2.3: "Licensee shall not contest the title of IBC to the Trademarks or registrations thereof or challenge the validity of this Agreement and Licensee shall not take any action or fail to take any action the result of which could reasonably foreseeably adversely prejudice IBC's interest in the Trademarks."

h. Section 3.1: "Licensee shall use the Chicago Trademarks owned by IBC only in the form and manner and with appropriate legends as prescribed from time to time by IBC."

i. Section 3.2: "Licensee shall not use any of the Trademarks owned or licensed by IBC as its corporate name or title in whole or in part and shall not, without the prior written consent of IBC, alter or combine such owned or sublicensed Trademarks with other terms, or use such Trademarks in connection with any business other than as licensed hereunder."

j. Section 5.2: "IBC shall have the right to terminate this Agreement in the event of the material breach of any of the terms hereof by Licensee. . . . A material breach shall include but not be limited to a failure of LBB to maintain the character and quality of goods sold under the Trademarks as provided for in Section 6.1 hereof."

k. Section 5.3: "Upon the termination of this Agreement pursuant to Sections 1.2 or 5.2, Licensee shall cease and terminate all use of any kind whatsoever of the Trademarks. Licensee shall not replace the Trademarks with any other words, logos or phrases confusingly similar thereto."

l. Section 6.1: "Goods sold or otherwise distributed by Licensee under the Trademark shall be substantially of the same character and quality as the goods currently sold by IBC under the Trademarks. . . . Licensee shall use raw materials, ingredients and packaging supplies of a quality at least as high and consistent with the quality previously used by IBC in connection with the same or similar products."

m. Section 7.1: "Claims Against Third Parties. Licensee and IBC shall each notify the other of any actual, alleged or threatened infringement of rights under the Trademarks in the Territory by any third party promptly as it comes to the attention of Licensee or IBC, as the case may be. IBC shall have the sole discretion at its own cost and expense, to bring proceedings involving the Trademarks in its own name and to join Licensee as a party against any third party infringing either directly or contributorily. If IBC should determine to bring such suit, all recovery shall be retained by IBC. Licensee shall reasonably assist IBC as requested and cooperate in any such litigation at IBC's expense; provided, however, IBC shall have full control over the conduct of the suit, including the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder.

n. Section 7.2: "Claims by Third Parties. Licensee and IBC shall promptly notify each other of all information as it comes into their possession relative to any actual or threatened infringement suit by third parties in relation to Licensee's use of

the Trademarks. IBC shall have the sole right, but not the obligation, to control at its own cost and expense the defense of such suit, including but not limited to the right to select counsel of its choice and enter into any settlement of the suit provided that such settlement does not materially prejudice Licensee's rights hereunder."

o.      Section 8.1: "No Warranty For Claims by Third Parties. IBC has the right to use and license others to use the Trademarks it owns in the manner contemplated by this Agreement; however, IBC specifically disclaims any warranty that Licensee will be free from claims of third parties with respect to the Trademarks. Licensee acknowledges that it has no right to indemnification from IBC as a result of any third party challenges to Licensee's use of the Trademarks hereunder. Subject to the preceding sentence, IBC shall defend, indemnify and hold Licensee harmless against any and all claims, demands, causes of action, judgments, cost and expenses, including reasonable attorney's fees, arising out of any willful act or omission by IBC with respect to any of its obligations under this Agreement."

p.      Section 8.2: "Indemnification of IBC by Licensee. Licensee shall defend, indemnify and hold IBC harmless against any and all claims, demands, causes of action, judgments, cost and expenses, including reasonable attorney's fees arising out of Licensee's manufacture, distribution, shipment, advertising, promotion, offering for sale or sale of the goods sold under the Trademarks, or any defects in such goods other than those supplied by IBC to Licensee, as well as related advertising and promotional materials, provided Licensee receives prompt notice of such claim, demand, cause of action or judgment and is permitted to deal with it in Licensee's sole discretion."

q.      Section 9.1: "This Agreement, together with the Exhibits and Schedules hereto and the agreements referenced herein, constitute the entire agreement between the parties respecting the subject matter hereof and supersedes all prior written or oral agreements or understandings in variation of its terms."

r.      Section 9.2: "Except as expressly set forth herein, this Agreement shall not be modified, altered or amended except by Agreement in writing signed by duly authorized representatives of the parties hereto."

s.      Section 9.3: "This Agreement shall be governed by the statutory and decisional law of the State of Illinois. . . ."

t.      Section 9.5: " Except as otherwise specifically provided herein, no failure or delay on the part of any party hereto to enforce any provision of this Agreement or to exercise any right granted hereby shall operate as a waiver thereof unless or until the right to enforce any such provision or to exercise any such right has been waived in writing by such party."

10.     The APA required the parties to allocate the fair market values of the assets being transferred and provided that the sale to LBB/CBC would be structured as a "Section 1031 Like-Kind Exchange" by IBC.

11.     The parties allocated $11,880,000 of the $20 million purchase price to various tangible assets (such as land, buildings and equipment) and the balance of $8,120,000 to "Intangibles (including the Trademark License)."

12.     Of the $20 million paid to IBC by LBB and CBC, $17 million was paid in cash at closing, and the buyers executed a $3 million note. The note was paid in full in 2002.

13.     IBC's internal tax documents reflect the transfer of the trademarks as a sale. These documents describe the trademark transfer as a "Sale to Lewis," "Goodwill sold to Lewis," "LEWIS BROS SALE," "Proceeds from sale to Lewis." IBC's tax returns state, "IBC sold its operations in Chicago/Central Illinois to Lewis Bros."

14.     Between the closing of the transaction and mid-1998, IBC and LBB/CBC exchanged letters modifying the geographic areas covered by the License.

15.     On October 14, 1998, IBC sent a letter to LBB/CBC regarding certain Italian bread packaging.

16.     In February 1999 IBC filed in the District Court a motion and memorandum, seeking to modify or terminate the Judgment so that IBC could repurchase the Webers' Bread assets and trademarks (in the Southern California Territory) that IBC had also been required to sell under the terms of the Judgment. IBC later withdrew its motion to modify the Judgment.

17.     On or about November 15, 2001, IBC sent LBB/CBC a letter regarding termination of the UPC numbers affiliated with the License pursuant to the Asset Purchase Agreement.

18.     In May 2004, LBB/CBC and IBC exchanged correspondence regarding certain alleged violations of trademarks and trade names by IBC.

19.     Three of the principal trademarks included in the License are registered with the United States Patent and Trademark Office ("PTO") under registration number 072110, 0543840, and 1015409, respectively.

## DISCUSSION

As noted above, the sole issue before the Court is whether the License is an executory contract within the meaning of 11 U.S.C. § 365.

Under 11 U.S.C. §365 a debtor-in-possession "may assume or reject any executory contract or unexpired lease. . . ." In the absence of a statutory definition of "executory contract," its

definition has been left to the courts. In the Eighth Circuit, courts evaluate whether a contract is executory under the standard set forth by Professor Vern Countryman (the "Countryman Standard").[4] Under the Countryman Standard, a contract is executory when "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."[5] Stated concisely, a court must determine "whether both parties have unperformed material obligations under the [a]greement."[6] The materiality of an obligation is determined by the applicable state law.[7] The License is governed by Illinois law, which defines a material obligation as an "important or substantial" obligation, the breach of which entitles the non-breaching party to damages.[8]

Courts applying the Countryman Standard generally hold that license agreements are executory contracts within the meaning of § 365 of the Bankruptcy Code.[9] The Plaintiffs have not identified, nor has the Court found, any precedent to the contrary. And the Court finds no basis on which to distinguish the License in this case from licenses found to be executory by the courts cited above.[10]

The seminal case of *In re Exide Technologies* is factually analogous to this case and compels

---

[4] *See Northwest Airlines, Inc. v. Klinger* (*In re Knutson*), 563 F.2d 916, 917 (8th Cir. 1977); *In re Farmland Indus., Inc.*, 294 B.R. 903, 922 (Bankr. W.D. Mo. 2003).

[5] Vern Countryman, *Executory Contracts in Bankruptcy*: Part I, 57 Minn. L. Rev. 439, 460 (1973).

[6] *In re Exide Technologies, Inc.*, 340 B.R. 222, 229 (Bankr. D. Del. 2006) *aff'd, EnerSys Delaware, Inc. v. Exide Technologies. Inc.*, 2008 WL 522516, Case No. 02-11125 (D. Del. Feb. 27, 2008).

[7] *Id.*

[8] *See Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. Partnership*, 619 N.E.2d 144, 154(Ill. App. Ct.1993); *Anderson v. Long Grove Country Club Estates, Inc.*, 249 N.E.2d 343, 349-50(Ill. App. Ct. 1969). It appears that Illinois courts have also adopted the Countryman Standard for determining whether a contract is executory. *See, e.g.*, *In re Liquidation of Inter-American Ins. Co. of Illinois*, 768 N.E.2d 182, 191 (Ill. App. Ct. 2002).

[9] *See, e.g.*, *Everex Sys., Inc. v. Cadtrak Corp.* (*In re CFLC, Inc.*), 89 F.3d 673 (9th Cir. 1996); *Fenix Cattle Co. v. Silver* (*In re Select-a-Seat Corp.*), 625 F.2d 290 (9th Cir. 1980); *In re Exide Technologies*, 340 B.R. 222; *In re HQ Global Holdings, Inc.*, 290 B.R. 507 (Bankr. D. Del. 2003); *In re Golden Books Family Entertainment, Inc.*, 269 B.R. 300 (Bankr. D. Del. 2001); *In re Access Beyond Technologies., Inc.*, 237 B.R. 32 (Bankr. D. Del. 1999); *In re Petur U.S.A. Instrument Co., Inc.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983).

[10] *See supra n. 9.*

a finding that the License is, indeed, an executory contract subject to assumption under 11 U.S.C. § 365. In *Exide Technologies*, the debtor, Exide Technologies, Inc. ("Exide"), sold its industrial battery division to EnerSys Delaware, Inc. ("EnerSys") in 1991 and entered into several agreements in connection with the transaction, including a license agreement and an asset purchase agreement.[11] EnerSys paid Exide more than $135 million at closing.[12] In 2002, Exide filed its Chapter 11 bankruptcy and sought to reject the license agreement as an executory contract.[13] EnerSys objected, arguing, *inter alia*, that the agreement was not executory.[14]

The *Exide Technologies* court reviewed the obligations of each party under the license agreement and determined that Exide and EnerSys both had unperformed, material obligations. For Exide these obligations included an obligation to allow EnerSys to use the trademarks set forth in the agreement, an obligation not to prosecute EnerSys for use of the trademarks, and an obligation to refrain from granting licenses to third parties in the same area.[15] "[A] licensor's promise to refrain from suing the licensee for infringement is the *raison d'etre* for a [trademark] license."[16] On the other side, EnerSys had an obligation to maintain certain quality standards in its use of the trademarks and to refrain from using the Exide mark outside of the industrial battery business.[17] Finally, the court found that ongoing obligations to indemnify the other party were material for both Exide and EnerSys.[18]

The IBC – LBB/CBC License has similar unperformed, material obligations. IBC's obligations under the License include the duty to:

---

[11] 340 B.R. 222 (Bankr. D. Del. 2006).

[12] *Id*. at 227-28.

[13] *Id*. at 228.

[14] *Id*. at 228-29.

[15] *Id*. at 235. ("Indeed, Exide agreed not to grant any licenses to third parties which would be inconsistent with EnerSys's use of the mark. This agreement, in and of itself, is a material obligation of Exide.").

[16] *Id*. at 234 (quoting *Everex Sys., Inc.*, 89 F.3d at 677).

[17] *Id*. at 232-33.

[18] *Id*. at 237.

1. maintain and defend the Trademarks;

2. control the quality of the goods produced with the Trademarks;

3. notify LBB/CBC of any actual, alleged or threatened infringement of the Trademarks;

4. at IBC's discretion, maintain "full control" over any infringement actions;

5. refrain from settling any infringement action in a manner that materially prejudice's LBB/CBC's rights under the License;

6. refrain from suing LBB/CBC for trademark infringement;

7. refrain from using the Trademarks in the Chicago Territory; and

8. indemnify LBB/CBC "against all claims… arising out of any willful act or omission with respect to any of its obligations under this Agreement."

LBB/CBC's obligations under the License include the duty to:

1. refrain from sublicensing the Trademarks;

2. limit the use of the Trademarks to (a) the specified Territory, and (b) the specified "fresh and returned bread, buns, bread rolls, and other bakery products;"

3. refrain from registering the Trademarks, or contesting IBC's title to the Trademarks;

4. execute documents "to preserve and extend the Trademarks and registrations thereof within the Territory;"

5. use the Trademarks "only in the form and manner and with appropriate legends as prescribed from time to time by IBC;"

6. not use the Trademarks "as its corporate name or title" and not alter or combine the Trademarks with other terms without the prior written consent of IBC, "or use such Trademarks in connection with any business other than as licensed hereunder;"

7. maintain the character and quality of all goods sold under the Trademarks;

8. notify IBC of any actual, alleged or threatened infringement of the Trademarks; and

9. assist IBC in any infringement litigation and indemnify IBC for any and all actions arising out of LBB/CBC's use of the Trademarks.

The existence of all of these material, unperformed (or continuing) obligations leads the Court to the inescapable conclusion that the License is executory and, therefore, subject to assumption under 11 U.S.C. § 365.

LBB/CBC offer several arguments to the contrary, but none of these has merit.

LBB/CBC argue that *Exide Technologies* is not controlling here. But the only support LBB/CBC cite for this proposition is a law review article that – albeit astute in its observation that permitting a trademark licensor to reject a perpetual license smacks of unfairness – offers no relevant authority to support a finding that a trademark license is not executory.[19] Additionally, the law review article is inapposite inasmuch as the Debtor now seeks to assume, not reject, the license.

LBB/CBC argue that the License isn't executory because the parties have not been actively performing their material obligations. However, many of the "unperformed" material obligations flowing between the Debtor and LBB/CBC involve refraining from taking certain actions on an ongoing basis, such as the obligation not to sue the other for use of the licensed trademarks within each party's territory. The absence of evidence that either party has breached this obligation or taken action to prevent the other from breaching this obligation is actually proof that the parties are honoring this obligation and that it remains unperformed for all intents and purposes.

Moreover, the non-performance or lack of enforcement of a material contractual obligation is irrelevant to the issue of whether a contract is executory. Under some circumstances, an obligor's failure to enforce a material obligation operates as a waiver of that obligation. But the fact that an obligor hasn't enforced certain obligations under a contract does not mean that the contract is not executory – especially where the contract at issue here specifically provides in Section 9.5, "Except as otherwise specifically provided herein, no failure or delay on the part of any party hereto to enforce any provision of this Agreement or to exercise any right granted hereby shall operate as a waiver thereof unless or until the right to enforce any such provision or to exercise any such right has been waived in writing by such party."

LBB/CBC argue that the License is not executory because IBC has treated it as a completed sale for accounting and tax purposes. But those considerations are irrelevant to the issue of whether the contract is executory under the Countryman Standard and for purposes of assumption under § 365. More important, however, the Court does not need to – and will not under the parol evidence

---

[19] Xuan-Thao Nguyen, *Selling It First, Stealing It Later: The Trouble With Trademarks in Corporate Transactions in Bankruptcy*, 44 Gonz. L. Rev. 1 (2009). The Court recognizes the potential unfairness that can result when a licensor rejects a license; Congress afforded a remedy to licensees of patents and copyrights in 11 U.S.C. § 365(n), but it did not offer the same protection to trademark licensees. Rectifying this unfairness, however, rests with Congress, not the courts.

rule – look beyond the face of the License, which unambiguously indicates that the parties did <u>not</u> intend a sale of the Trademarks. To wit, Section 2.1 states, "Licensee acknowledges and agrees that IBC is the exclusive owner of or has the right to use, the Trademarks and all goodwill associated therewith and that IBC shall retain the full ownership interest in and to the Trademarks; the associated goodwill and all registrations granted thereon; and that all use of the Trademarks by Licensee shall inure to the benefit of and be available to IBC. Except for the rights specifically granted or licensed herein, Licensee shall have no rights to the Trademarks."

Finally, LBB/CBC argue that IBC has waived its right to, or should be estopped from, asserting that the License is executory. The Debtor's omission of the License from its bankruptcy schedules, while curious, is insufficient to estop the Debtor (including IBC) from asserting that the License is executory. It does not appear that LBB/CBC was misled or prejudiced, as evidenced by their filing of the Complaint in this adversary action (and an objection to confirmation of the Plan) prior to commencement of the confirmation hearing. And the omission was corrected by the filing of Amended Plan Exhibit O and the Debtor's filing of a motion to reject the License, all prior to the confirmation hearing. Further, as noted above, the Debtor's treatment of the License as a sale for tax and accounting purposes has no bearing on whether the contract is executory for purposes of § 365; ergo, it has no bearing on whether the Debtor can assert that the contract is executory for purposes of 11 U.S.C. § 365.

## CONCLUSION

For the reasons stated above, the Court finds that the uncontroverted evidence establishes that the license agreement between the parties granting the Plaintiffs a perpetual, royalty-free trademark license to certain brands of bread is an executory contract for purposes of assumption pursuant to 11 U.S.C. § 365.

A separate judgment consistent with this Memorandum Opinion will be entered pursuant to Fed. R. Bank. P. 9021.

**ENTERED** this 4th day of June 2010.

/s/ Jerry W. Venters

                                      HONORABLE JERRY W. VENTERS
                                      UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was mailed
conventionally or electronically to:
Paul M. Hoffman
Eric L. Johnson